Filed 11/20/25  P. v. Jones CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALIJONDRO JONES,<br><br>    Defendant and Appellant. | A169359<br><br>(Solano County<br>Super. Ct. No. FCR310886) |

Defendant and Appellant Alijondro Jones was convicted of first degree felony murder.  After the legal definition of murder and felony murder changed, he sought resentencing under Penal Code section 1172.6.[1]  The trial court denied relief, concluding that he was a major participant in the underlying robbery and acted with reckless indifference to human life.  We vacated the order to give the court an opportunity to consider more fully Jones's youth and maturity at the time of the crime.  On remand, the court again denied relief on the ground that he was a major participant and acted with reckless indifference to human life.  Now on appeal from that order, Jones contends:  (1) under the doctrine of claim preclusion, the judgment of

---

[1] All statutory references are to the Penal Code.  When Jones brought his petition for resentencing, it was pursuant to section 1170.95.  That section has been renumbered as section 1172.6 without substantial change.  Throughout the opinion, we refer to the statute by its current designation.

1

conviction barred the prosecutor from proving reckless indifference in the section 1172.6 proceeding; (2) the court's consideration of evidence that Jones bragged about shooting the victim was barred by the doctrine of issue preclusion and violated his constitutional rights to a jury trial and against double jeopardy; (3) the prosecutor's argument that his post-crime statements showed reckless indifference violated due process; (4) evidence of his post-crime statements was neither relevant nor sufficient to establish reckless indifference; and (5) there was insufficient evidence of reckless indifference in light of *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*) and the evidence that he was impulsive and subject to peer pressure at the time of the crime.

We will affirm the judgment. Jones's arguments regarding claim preclusion, issue preclusion, jury trial rights, double jeopardy, and due process are forfeited and meritless. His post-crime boasts shortly after the shooting were relevant to his state of mind at the time of the crime. *Emanuel* did not announce any new proposition of law and is readily distinguishable on its facts. With or without the evidence of Jones's post-crime statements, the trial court's finding of reckless indifference to human life was supported by substantial evidence, including evidence that he volunteered to perpetrate the midnight robbery of a drug dealer when others declined, participated in its planning, secured the firearm and insisted on taking ammunition because he "needed" it, was at the scene of the shooting of the robbery victim, and left the victim to die. From the totality of the circumstances, a reasonable trier of fact could conclude beyond a reasonable doubt that "at the time of the shooting, [Jones] acted with indifference toward the grave risk that someone *could be* killed." (*Emanuel, supra,* 17 Cal.5th at p. 895.)

2

# I. FACTS AND PROCEDURAL HISTORY

## A. Jury Trial and Conviction

In 2016, the Solano County District Attorney charged Jones with murder (§ 187, subd. (a)) and alleged that he personally and intentionally discharged a firearm that caused great bodily injury and death (§ 12022.53, subd. (d)). (*People v. Jones* (Dec. 26, 2019, A154492) [nonpub. opn.] (*Jones I*).) The evidence at trial, as we summarized in an earlier appeal, included the following.

"At approximately 1:30 a.m. on October 6, 2014, Vacaville police responded to a 911 call about a shooting at the Canyon Creek Apartments. They found 18-year-old Demetrius Ward in the front seat of his truck, unconscious and with a gunshot wound in his neck. A Ziplock bag with marijuana was found inside the truck, and a .45-caliber shell casing was found on the ground a few feet away. Ward was taken to the hospital, where he died. The murder weapon was never found.

"The 911 call was placed by Kai Hughes, who was also 18 years old. After providing conflicting stories about what happened, she eventually told police that Ward was shot by Jones during a botched marijuana robbery.

"In the months before the shooting, Hughes had associated with Jones as well as with Dezmon Frazier (for whom she sold drugs), Toriano Byrd (referred to by respondent and the trial court as 'Boyd'), Rhianna Cea, and Rick Paraiso. They frequented the home of Aimee Sabedra in the Canyon Creek Apartments and used drugs together. Hughes was also good friends with victim Ward, her former boyfriend.

"Before midnight on October 5, 2014, Hughes was at her aunt's home. She received a message from Ward via Twitter asking '[w]ho needs weed.' Through text messages, Ward told her he had high-quality marijuana to sell

and Hughes told him she wanted to buy it, indicating (falsely) that she had the money.  Ward arranged to pick her up.  Hughes called Frazier and Byrd, saying she wanted them to steal Ward's marijuana.

"Ward picked up Hughes, and she directed him to the Canyon Creek Apartments, falsely claiming she had left her purse with money there.  He pulled into the apartment complex and waited while Hughes went into Sabedra's apartment.

"In the apartment, Sabedra was asleep.  In a bedroom, Jones, Frazier and Byrd were smoking marijuana and using other drugs.  After Paraiso joined the group, they discussed a plan to rob Ward.  Hughes texted Ward and asked whether he would take $150; he indicated that $180 was the price. Byrd, who was carrying a gun in a shoulder holster, said he did not want to be involved.  Jones and Paraiso volunteered to commit the robbery; *Jones grabbed Byrd's gun, and when Byrd tried to remove the clip, Jones insisted on taking it, saying he would need it*.  [(Italics added.)]

"Jones and Paraiso walked toward Ward's truck.  Hughes followed and ducked behind a bush.  From there, she heard 'muffled' arguing and then heard a gunshot and saw a bright light.  Paraiso came running and took her back to Sabedra's apartment.  Jones walked in a few seconds later.  According to Hughes, *Jones said that Ward 'told me I needed to shoot him for his weed. I don't know who he thought he was so I shot him.'*  [(Italics added.)]

"After Jones said he had not gotten the marijuana or the bullet casing, Hughes texted Ward, 'Here I come,' and told the others she was going to pick up the casing.  When she found Ward injured in the truck, she called 911 and said her 'brother' had been shot.

"After the shooting, Sabedra was shaken awake.  Someone threw a heavy bundle on her lap and told her to hide it; she took the bundle to her

4

upstairs neighbor's apartment and placed it under a couch. Sabedra returned to her apartment, where Jones was joking. Sabedra walked with Jones to a convenience store; along the way, *Jones told Sabedra he had 'blasted that fool because he wouldn't give it up' and laughed*. [(Italics added.)]

"Frazier later told Sabedra to retrieve the object she had hidden. She got the bundle and saw it was Byrd's gun. When police interviewed Sabedra, she told them Jones was the shooter.

"Police arrested Hughes for Ward's murder and arrested Sabedra for being an accessory after the fact. (Pen. Code, §§ 187, 32.) Both agreed to testify against Jones and entered into immunity agreements. Hughes pleaded guilty to one count of attempted robbery and admitted a weapon use enhancement, and the murder count against her was dismissed. Sabedra pleaded guilty to one count of accessory after the fact with no jail time and the dismissal of an unrelated misdemeanor charge." (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1079–1081 (*Jones II*).)

The trial court instructed the jury that Jones could be guilty of first degree felony murder if a coparticipant committed the fatal act. The jury convicted Jones of first degree felony murder but found not true an allegation that he personally used a firearm in the commission of the offense. The court sentenced him to prison for 25 years to life, plus a consecutive three-year term for a separate case. (*Jones, supra*, A154492.) We affirmed the judgment in December 2019. (*Ibid.*)

B. <u>Statutory Amendments (SB 1437)</u>

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (SB 1437) amended section 188, subdivision (a)(3), to require express or implied malice for a murder conviction, except for felony murder under

5

section 189, subdivision (e).  (Stats. 2018, ch. 1015, § 2.)  As to felony murder, SB 1437 amended the statute to require that the perpetrator be the actual killer, an aider and abettor who acted with intent to kill, or a *major participant in the underlying felony who acted with reckless indifference to human life*.  (Stats. 2018, ch. 1015, § 3.)

SB 1437 also established a procedure for offenders convicted of murder under the prior law to seek resentencing in the trial court if they could not now be convicted of that crime given the amendments to sections 188 and 189.  (Stats. 2018, ch. 1015, § 4.)  If the petitioner states a prima facie case for relief, the court must issue an order to show cause and hold an evidentiary hearing unless the parties stipulate to the petitioner's eligibility for resentencing.  (§ 1172.6, subds. (c), (d)(1)–(2).)  At an evidentiary hearing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (d)(3).)

C.  Petition for Resentencing and First Resentencing Order

Jones filed a petition for resentencing in December 2020.  The trial court denied the petition after an evidentiary hearing, finding that the prosecution proved beyond a reasonable doubt that Jones was a major participant in the underlying robbery and acted with reckless indifference to human life.  (*Jones II*, *supra*, 86 Cal.App.5th at pp. 1082–1084.)

In finding that Jones was a major participant, the trial court noted that he was the one who grabbed Byrd's gun, and when Byrd tried to take the ammunition, Jones said he needed it and took it.  The court viewed this as "significant evidence inferring the defendant's willingness to kill [Ward] in order to accomplish the robbery."  (*Jones II, supra,* 86 Cal.App.5th at p. 1083.)  It also showed that Jones played a particular role in Ward's death.  Further,

6

the court observed that Jones left Ward to die after he was shot and then went home, saying that he shot Ward because he "wouldn't give it up," and laughed. (*Id*. at p. 1084.) Finding that Jones acted with reckless indifference to human life, the court again noted that Jones "*secured the gun making sure it was armed with ammunition and available,*" he was at the scene, he made no effort to stop the crime, there was no evidence that he minimized the possibility of violence, and he stated that he shot the victim because the victim would not turn over his drugs. (*Ibid*.) Jones appealed.

We addressed Jones's appeal in *Jones II*, a published decision. (*Jones II*, *supra*, 86 Cal.App.5th 1076.) We concluded that "[e]vidence in the record supported the conclusion that Jones was a major participant in the robbery and acted with reckless indifference to human life." (*Id*. at p. 1088.) In particular, we observed that "subjectively, Jones was willingly involved in the violent manner in which the robbery was perpetrated, consciously disregarded the significant risk of death, and knowingly created a grave risk of death; objectively, the risk of death was such that its disregard constituted a gross deviation from the standard of a law-abiding person." (*Id*. at p. 1090.)[2] We could not decide whether substantial evidence supported the trial court's ruling, however, because the record did not show that the court had fully considered Jones's youthful age at the time of the crime. (*Id*. at p. 1091.) We therefore concluded that "in the interest of justice, . . . it is best for

_____

[2] Jones argued, in part, that "the trial court was collaterally estopped from relying on evidence that he 'possessed the gun and admitted he was the shooter' at the section 117[2.6] hearing" because the jury had made a "not true" finding on the allegation that he personally used a firearm. (*Jones II*, *supra*, 86 Cal.App.5th at pp. 1084–1085.) We rejected the claim because "the . . . court did not relitigate (or find contrary to the jury's verdict) that Jones displayed, hit, or fired the gun that killed Ward," which was the issue on the firearm use enhancement. (*Id*. at p. 1086.)

the . . . court to have a meaningful opportunity to consider Jones's youth as part of the totality of the circumstances germane to determining whether he was a major participant who acted with reckless indifference to human life." (*Id.* at p. 1093.) We vacated the order denying Jones's resentencing petition and remanded for the court to incorporate Jones's youth in its analysis. (*Ibid.*)

### D. Resentencing Order After Remand

#### 1. Evidence of Youth and Maturity

Jones submitted a report by forensic psychologist Sumandeep Kaur, Psy.D., regarding his youth and maturity. Dr. Kaur opined that Jones "endorsed 4/10 items" on the "Adverse Childhood Experiences (ACEs)" scale, which assesses childhood trauma. Jones's ACEs score was based on his exposure to violence in the home, his father's intoxication during visits, his father's incarceration, and the fact he was raised in a single-parent household. Dr. Kaur stated that "[i]ndividuals who experience multiple[ ] ACEs are likely to engage in more risk-taking behaviors, resulting in higher risks for school failure, gang membership, unemployment, poverty, violent crime, and incarceration." According to Dr. Kaur, Jones's failure to form an attachment with his primary caregivers led him to turn to older peers and join a street gang. He became desensitized to violence and learned that the best defense against being a victim was to become an aggressor. The "cycle of exposure to violence, perpetration of violence, and use of drugs to self-medicate led to an unpredictable adolescent demeanor that appeared to persist despite advances in his chronological age, and likely rendered [Jones] unprepared to make informed decisions or consider the implications of his actions."

Dr. Kaur also opined that at the time of the offense, Jones "likely

8

possessed underdeveloped emotional and cognitive maturity, rendering him with less capacity to engage in informed decision-making." This suggested to Dr. Kaur "that his behavior was impulsive, and he was less able to assess the risk associated with his actions as a result of cognitive, emotional, and social immaturity." Jones's use of drugs around the time of the offense "likely dulled his ability to think logically and coherently, and to make informed decisions." Dr. Kaur further offered that the robbery was planned by older peers and posited that Jones was likely bowing to peer pressure and "likely failed to fully appreciate the dangers of their actions."

   2. <u>The Trial Court's Ruling</u>

On December 1, 2023, the trial court again denied the resentencing petition, concluding beyond a reasonable doubt based on all the evidence—including evidence of Jones's youth and maturity—that Jones was a major participant who acted with reckless indifference to human life.

In reaching its decision, the trial court adopted its findings from its initial denial of the petition. It also stated that it had read the parties's briefs and Dr. Kaur's report and was analyzing "the *Banks* and *Clark*[ ] factors with youth[-]related factors in mind." (Italics added.) (See *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).) The court then gave the following reasons for its denial—which we quote at length to show the extent of the court's evaluation.

"After careful review when I look back at the trial transcript and consider it, one, there was discussion about the 211 [(robbery)] prior to the robbery occurring. Mr. Frazier and Mr. Byrd initially indicated they did not want to do it, but *it was Mr. Jones who jumped up and said I'll do it. And then he goes to get Mr. Byrd's gun.* [(Italics added.)]

9

"It's noted he seemed excited about doing that. This is the testimony of Ms. Hughes. At this point there is really no evidence of any peer pressure. There is one area of questioning that might have suggested something. I'll come back to this. Again, he was excited to do it. *Mr. Byrd tries to take the magazine out of the gun, yet it's the defendant who says I'm going to need that too. To the Court that is clear evidence that he understands the risk of what he's about to engage in.* When he said *I will need that . . . ammunition. In my view that is requisite indifference.* No evidence of peer pressure on that. That is substantial. It's not impulsive in that they're talking about and planning it. . . . There are other individuals saying I'm not going to do it. They try to get the ammunition away. [(Italics added.)]

"As I think about it, *there is clear evidence the defendant's willingness that I may have to shoot and kill someone and recognition that that scenario might occur by going out to rob Mr. Ward.* Thereafter the defendant takes the gun and with the ammunition and goes out with Mr. Paraiso to engage in a robbery. And then it's noted when the defendant comes back into the house it's of concern after Mr. Ward has been shot *the defendant is bragging about having shot Mr. Ward.* Again, this was an issue in the appellate opinion. But I'm not saying that the evidence showed—I'm not saying that Mr. Jones was the shooter. That was—the jury did not decide that personal use allegation. What I am simply using this for is the defendant's mindset at this point. [(Italics added.)]

"After Mr. Ward has been shot, whether it's him or Mr. Paraiso, he's continuing to joke around. And later when he [t]alks with Ms. Sabedra he's *making comments about 'I blasted that fool.'* There was some discussion in Dr. Kaur's report that maybe the defendant had become numb to this sort of violence. I gave that consideration here, but my view [is] that's not being

10

impulsive or a transitory rashness or impetuosity. It's really more of an indifference. That situation, being numb to the situation of violence, is also inconsistent with what occurred in terms of the facts here of being excited to get the gun, saying I'm going to need it and coming back and *bragging* and joking about it. So especially in light of being excited, that is really not being numb to it. It's hard to reconcile that. As I noted, there was one area of the questioning that I saw during the trial and at least from the transcript I have it's at page 243, lines 18 through 27 where [defense counsel] is asking Ms. Hughes 'Now, when you got back to the apartment Mr. Frazier tried to talk you out of robbing Mr. Ward, did he?' [¶] Answer: 'He didn't talk me out of anything.' [¶] Question: 'Well, didn't he say it wasn't a good idea to rob Mr. Ward?' [¶] Answer: 'Toriano said Desmond wasn't doing it because he's already in trouble.' [¶] Question: 'That wasn't trying to talk you out of it. They're saying hey, you guys do it. And we'll all enjoy the profits of it basically.' [(Italics added.)]

"I considered that whether it might show peer pressure or something along those lines. In my view there is *no significant evidence here [that] there was peer pressure* on the defendant to go out and jump up to say I'll do it and take the gun, I'm going to need that ammunition. To me that is not significant such that it would show the defendant was peer pressured into this, so [it] does not appear to be [an] impulsive or impetuous act in terms of factors of youth that would change my analysis of the *Banks* and *Clark*[ ] factors. I did also consider the defendant's upbringing and the information by Dr. Kaur and Ms. Davis, and I agree with the People's arguments [that Jones stated he came from a good home with food and material goods, denied being the victim of abuse, and barely knew his father]. I'll note, one, I did not clearly see or not really see impulsivity or susceptibility or peer pressure even

11

in those reports. There was discussion about peer pressure to use cocaine about age 18 or so. [(Italics added.)]

"Other than that the comments were to Dr. Kaur at page 9, 'everybody like[d] me. Even when I was a kid I was manipulative and controlling.' And of concern was he said when discussing impulse or risky behaviors [a]s a kid, he declined to elaborate. One wonders what the credibility of that statement is. There was discussion at page 10 about the streets enticed him in 2014. Shows some recognition that he's perhaps choosing to go this path. He also noted at page 16 of Dr. Kaur's report he was good at manipulating but that he chose not to do it anymore. There [are] other comments. 'Robbing people felt like less work. You don't have to work for the money[,]' even then as a young child, eight or nine. It's very sad to hear, but this is what these reports are indicating that he liked the character John Gotti and would like to be like him. So while incredibly unfortunate, this is the life Mr. Jones grew up in. *It does not support [that] killing Mr. Ward was [an] impulsive or impetuous act as a result of peer pressure or transient rashness.* [(Italics added.)]

"As to whether he appreciate[d] the risk and consequences of his conduct, as the People noted, he did have friends and family members who were killed. So he knows the consequences of violent conduct and what can occur. Dr. Kaur also noted, I believe it's at page 7, that [at] about 18 or 19 years old Mr. Jones began to realize he was involved, too involved but seemed too late to get out. So, again, there was some awareness of his lifestyle choices at that point. So I also considered the progress that he's made in state prison. There [were] initially some violations for fighting, and there was some gang involvement as of about looks like 2021. He started on the path of employment, taking classes. So I have that in mind as well.

12

"I would just also note Dr. Kaur's opinion, [s]he commented that this was likely a relatively benign inception event, especially planned by peers he trusted and [the] repeated exposure to violence activated his body stress response by shutting down during the act that led to Mr. Ward's death and likely of social pressure of his peers. *The Court does not see the evidence supporting that. This is difficult to call [a] relative[ly] benign inception incident when one is going out with a firearm, armed to rob someone.* Peers he trusted, and the defendant characterized himself as a leader. And there is nothing to indicate peer pressure or he's just bowing to their request of him. He's almost an equal participant in the discussion and planning of this event. [(Italics added.)]

"As to whether he shut down during the incident, again, that seems to be contradicted by him being excited to commit the crime and then afterwards laughing and making comments that he did bragging about it. Again, as I said, likely bowing to social pressure of his peers, [there] wasn't . . . evidence of that other than the comment 'we can all get the proceeds.' I don't see that as significant evidence of peer pressure here. In fact, the other peers had given him an out. 'I don't want to do it. Take the ammunition out.' *It's the defendant who ultimately insists on the gun being loaded.* [(Italics added.)]

"There was also argument in the defense papers and I believe Dr. Kaur's . . . report, this idea that as a result of his youthful experiences he did this crime to maintain the respect of his older peers. I considered that as well, but I don't find that to be particularly persuasive. The defendant was already experienced in having been involved in criminal activity, described himself as a leader and, again, people were providing him essentially an out by refusing to participate in the 211 [(robbery)] and removing the bullets

13

from the gun. But the defendant went on to partake in that, so in my view that does show, one, he remains a major participant and . . . his indifference to the consequences here. So considering all the evidence here along with the new arguments I continue to find beyond a reasonable doubt that he's a major participant in the murder of Mr. Ward and that he acted with reckless indifference to human life."

Jones timely appealed.

## II. <u>DISCUSSION</u>

Jones challenges only the finding that he acted with reckless indifference to human life. Specifically, he contends that (1) the prosecutor was barred from proving reckless indifference under section 1172.6 due to claim preclusion principles; (2) the trial court should not have considered his post-crime statements about the shooting because the jury found that he did not personally use a firearm; (3) the prosecutor's use of those post-crime statements to argue reckless indifference in the section 1172.6 proceedings violated due process; (4) his post-crime statements and other evidence did not establish reckless indifference, particularly in light of *Emanuel, supra,* 17 Cal.5th 867, and evidence of his youth and impulsivity. Aside from some of his arguments being forfeited, all of them lack merit.

### A. <u>Claim Preclusion</u>

Jones contends that the prosecution could have alleged a felony-murder special circumstance against him by the time of his jury trial. Because such an allegation would have resulted in the litigation of reckless indifference at his trial, he argues that the judgment entered as a result of his trial precluded the prosecution from thereafter proving reckless indifference in a section 1172.6 proceeding. He, however, forfeited this argument. Moreover,

14

the doctrine of claim preclusion does not bar an evidentiary hearing under section 1172.6.

### 1. Forfeiture

Jones did not assert claim preclusion at his most recent section 1172.6 hearing. Nor did he raise it at his first evidentiary hearing or in his appeal from the initial denial of his petition (*Jones II*). His claim preclusion argument is therefore forfeited. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881 (*Sheena K.*); *David v. Hermann* (2005) 129 Cal.App.4th 672, 683.)

Jones contends that he is really challenging the sufficiency of the evidence, which is preserved without explicit objection in the trial court. (*People v. Butler* (2003) 31 Cal.4th 1119, 1126.) But an assertion of claim preclusion does not challenge the sufficiency of the evidence. To the contrary, claim preclusion means that the second action brought by the plaintiff is *barred*, *regardless* of the evidence. (See *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 893, 896–897 (*Mycogen*).)

Jones also asserts that we should nonetheless reach the merits of his arguments because "claim preclusion is a facet of the Fifth Amendment Double Jeopardy Clause" and may be resolved as a pure issue of law. The Double Jeopardy Clause, however, does not apply to section 1172.6 resentencing proceedings. (See *People v. Hernandez* (2021) 60 Cal.App.5th 94, 111 [evidentiary hearing under former section 1170.95 "does not implicate double jeopardy because [the statute] 'involves a resentencing procedure, not a new prosecution' "]; *People v. Myles* (2021) 69 Cal.App.5th 688, 704 (*Myles*) ["double jeopardy principles are not at stake" in former section 1170.95 proceedings because the "defendant is voluntarily seeking to vacate her prior conviction, not subjecting herself to a new trial or the possibility of increased punishment"].)

However, because Jones contends that his attorney's failure to raise the issue would constitute ineffective assistance if it needed to be raised, we address the merits of Jones's claim preclusion argument.

    2. <u>Merits</u>

Jones contends that "[u]nder the claim preclusion doctrine of merger, all claims in vindication of th[e] primary right that the People raised or could have raised in the original trial merged into the judgment of conviction in the People's favor, and the prior judgment itself serves as a defense." (Boldface omitted.) Because the prosecution could have alleged a felony-murder special circumstance that would have required proof that he was a major participant who acted with reckless indifference, Jones urges that the prosecutor is precluded from proving it now. But "claim preclusion[ ] prevents relitigation of the same cause of action *in a second suit* between the same parties or parties in privity with them." (*Mycogen*, *supra*, 28 Cal.4th at p. 896, italics added; see also *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.) The former judgment must be in a *different action* (*Mycogen*, at pp. 896–897), and the point is to avoid relitigating a cause of action under a different legal theory and the piecemeal litigation that arises by splitting a single cause of action (*id*. at p. 897).

Claim preclusion therefore does not apply here. The section 1172.6 proceeding was not a second prosecution against Jones for Ward's murder. Rather, Jones initiated the section 1172.6 postconviction proceedings by filing a petition for a reduced sentence. To defend against Jones's petition once a prima facie showing was made, the prosecution was statutorily required "to prove, beyond a reasonable doubt, that [Jones] is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) The prosecution was not

16

requesting a judgment beyond the existing conviction and sentence; it was merely seeking to preserve the judgment it already obtained. (*Myles*, *supra*, 69 Cal.App.5th at p. 706 ["a sentence modification under section 117[2.6] is an act of lenity and not a criminal trial"].)

Moreover, claim preclusion is a common law defense that the Legislature can abrogate. The point of section 1172.6 is to determine if the prosecutor, who obtained a murder conviction on one theory, could prove beyond a reasonable doubt that the defendant could be convicted of murder under a different theory consonant with current law. It would be contrary to statute and common sense to bar the prosecution from doing so under claim preclusion principles. Indeed, an equitable exception to claim and issue preclusion arises where, as here, there has been a significant change in the law since the original judgment. (See *People v. Strong* (2022) 13 Cal.5th 698, 716 (*Strong*) [recognizing an equitable exception to the issue preclusion doctrine for cases decided before *Banks* and *Clark*].) Jones's claim preclusion argument fails.

B. Post-Crime Boasts: Jury Trial; Issue Preclusion; Double Jeopardy

In its order denying the section 1172.6 petition, the trial court mentioned Jones's purported post-crime boasts about shooting Ward. Jones contends the court's reliance on those boasts contravened the jury's not true finding on the section 12022.53 firearm-use allegation, because that finding "necessarily meant the jury did not credit" Hughes's and Sabedra's testimony that Jones said he shot Ward. Jones therefore urges that the court violated his federal and state constitutional jury trial rights, issue preclusion principles, and the double jeopardy clause.

Jones's arguments are forfeited and meritless. Issue preclusion does not apply because, among other things, whether Jones said he was the

17

shooter is not an ultimate fact the prosecutor had to prove. Furthermore, the premise for all of Jones's arguments—that the not true finding necessarily meant that the jury did not credit the testimony about Jones's post-crime boasts—is incorrect.

### 1. Forfeiture and Law of the Case

Jones did not raise his jury trial, double jeopardy, and issue preclusion arguments in the trial court. The arguments are therefore forfeited. (See *People v. Morales* (2003) 112 Cal.App.4th 1176, 1185.)[3]

Jones did argue at the initial evidentiary hearing and in *Jones II* that the prosecution could not relitigate whether he possessed the gun and was the *actual killer*, because the jury decided the issue by its not true finding on the firearm-use enhancement. (*Jones II*, *supra*, 86 Cal.App.5th at p. 1085 & fn. 4). But in this appeal, Jones argues that the not-true finding showed that the jury did not "credit" the testimony about these statements, apparently meaning that the jury did not believe beyond a reasonable doubt that the statements were made and/or that they were true. To the extent Jones's current argument is different than what he asserted before, it cannot be said that he preserved it. (*People v. Pearson* (2013) 56 Cal.4th 393, 416 ["failure to make a timely and specific objection" on the ground raised on appeal forfeits the claim].)

To the extent that Jones is merely repeating the issue preclusion argument that he raised in *Jones II*, the People urge that the argument is foreclosed by the law of the case. (*People v. Jurado* (2006) 38 Cal.4th 72, 94 ["a principle or rule that a reviewing court states in an opinion and that is

---

[3] Jones argues that he did not waive his right to a jury trial. The point, however, is that he forfeited his right to assert that his jury trial right was violated by failing to assert that right below.

necessary to the reviewing court's decision must be applied throughout all later proceedings in the same case, both in the trial court and on a later appeal"]; *People v. Gray* (2005) 37 Cal.4th 168, 197 [law of the case applies where the point of law was actually presented and determined by the court].) However, we decline to rely on the law of the case doctrine because Jones appears to be making a new claim preclusion argument that he did not raise below. Instead, we proceed to the merits, notwithstanding any forfeiture, because Jones also argues ineffective assistance of counsel.

### 2. Issue Preclusion[4]

"Issue preclusion applies where (1) the issue sought to be precluded from relitigation is identical to the one decided in a former proceeding; (2) the issue was actually litigated and necessarily decided in the former proceeding; (3) the decision in the former proceeding is final and on the merits; and (4) the party against whom preclusion is sought is the same as, or in privity with, the party to the former proceeding." (*Jones II*, *supra*, 86 Cal.App.5th at p. 1085, citing *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, fn. omitted; see also *Strong*, *supra*, 13 Cal.5th at p. 716.) Even when these elements are met, however, the doctrine is not applied unless it ensures

---

[4] In *Jones II*, it was unnecessary to decide whether issue preclusion could ever apply in a section 1172.6 proceeding because it did not apply as Jones had urged in that appeal. (*Jones II*, *supra*, 86 Cal.App.5th at p. 1085.) The California Supreme Court has not decided whether issue preclusion "applies wholesale to criminal resentencing proceedings generally, or even section 1172.6 proceedings specifically." (*People v. Curiel* (2023) 15 Cal.5th 433, 451; see also *Strong*, *supra*, 13 Cal.5th at pp. 715–716.) The court in *Curiel* "believe[d] its contours are informative in this context" (*Curiel*, at p. 451), but *Curiel* and *Strong* involved the denial of a resentencing petition at the prima facie stage where the trial court was not a factfinder.

19

fairness to the parties. (*Strong*, at p. 716; *People v. Hart* (2025) 113 Cal.App.5th 1099, 1109 (*Hart*).)

In *People v. Santamaria* (1994) 8 Cal.4th 903 (*Santamaria*), our Supreme Court addressed issue preclusion in the context of a retrial. There, the defendant had been convicted of murder but the jury had found a knife-use allegation not true. (*Id.* at p. 909.) The murder conviction was reversed on appeal. (*Ibid.*) On retrial, the defendant argued that the prosecution was precluded from proceeding on any theory that he used a knife during the murder. (*Id.* at pp. 909–910.) Our high court disagreed, holding that collateral estoppel principles did not bar consideration of the defendant's knife use at retrial for two reasons.[5] First, the jury's rejection of the knife-use allegation at the original trial did not decide the *identical issue* that the defendant sought to preclude at retrial, which was whether he was guilty of murder. (*Id.* at pp. 919–920, italics added.) The finding reflected only that the jury had reasonable doubt that the defendant specifically used a knife. (*Id.* at pp. 917–921.) Second, the use of a knife to kill the victim was not *an "ultimate fact" to be proved beyond a reasonable doubt in the retrial.* (*Id.* at pp. 921–922, italics added.) It could therefore be considered, along with other probative evidence, in determining the defendant's guilt of murder. (*Id.* at p. 922.) That was permissible even though the original jury harbored a reasonable doubt as to that specific fact, since evidence of the fact could be proved to a lesser degree than the ultimate facts required to reach a murder verdict and would still be probative in the jury's murder determination. (*Ibid.*)

---

[5] Collateral estoppel is also known as issue preclusion. (*Samara v. Matar* (2018) 5 Cal.5th 322, 326.)

Both of *Santamaria*'s rationales for rejecting issue preclusion apply here.  (See *Hart, supra,* 113 Cal.App.5th at p. 1111.)  First, the issue of whether Jones made the statements about shooting Ward is not identical to the issue that the jury actually and necessarily decided in rejecting the firearm-use allegation.  As we stated in *Jones II*, "the relevant issue decided by the jury was whether Jones personally used a firearm in the commission of the crime. . . .  By finding the allegation not true, the jury determined that the prosecution had not proven beyond a reasonable doubt that Jones menacingly displayed a gun, hit someone with it, or intentionally fired the gun that killed Ward." (*Jones II*, *supra*, 86 Cal.App.5th at p. 1085.)  In rejecting the firearm-use allegation, the jury may have concluded that Jones never said he shot Ward *or* that, even if he did say it, the evidence was insufficient to prove he was the shooter.  The jury did not have to decide whether the statement, even if it did not establish that Jones was the shooter, nonetheless reflected a reckless indifference to human life.

Second, whether Jones made the statements to Hughes and Sabedra about killing Ward was not a fact that the prosecution had to prove beyond a reasonable doubt to support a murder finding in the section 1172.6 proceeding.  Accordingly, the issue preclusion doctrine did not bar the trial court from considering evidence of Jones's post-crime statements in determining whether he was guilty of murder under current law.  (*Hart*, *supra*, 113 Cal.App.5th at p. 1111 ["Under *Santamaria*, the jury's not true finding on the firearm use allegation in Hart's trial does not have preclusive effect here because it is not an ultimate fact necessary to find Hart guilty of murder"].)

Jones's reliance on *People v. Arnold* (2023) 93 Cal.App.5th 376 is misplaced.  *Arnold* held that under the issue preclusion doctrine, the trial

court "erred in finding that defendant stabbed the victim to death after the jury found not true an allegation that defendant personally used a knife." (*Id*. at pp. 379, 387.)  Here, by contrast, the court did *not* make findings contrary to the jury's findings.  It did not find that Jones shot Ward, and it explicitly rejected an actual killer theory based on the jury's not true finding on the firearm-use allegation.  (*Jones II*, *supra*, 86 Cal.App.5th at p. 1082.)  Moreover, *Arnold* did not even address the ultimate fact requirement.  (*Hart, supra*, 113 Cal.App.5th at p. 1112 [distinguishing *Arnold* on that ground].)

### 3.  Jury Trial or Double Jeopardy Claims

Jones's arguments concerning his jury trial rights and double jeopardy, like his issue preclusion claim, are premised on the notion that the not-true finding on the section 12022.53 firearm-use allegation "necessarily meant the jury did <u>not</u> credit" Hughes's and Sabedra's testimony that Jones said he killed Ward.  Jones's premise is incorrect.

The jury's not true finding on the firearm-use allegation does not mean that the jury decided that Jones never made the statements to Hughes and Sabedra about killing Ward.  It showed merely that the prosecution had not proved beyond a reasonable doubt that Jones menacingly displayed a gun, hit someone with it, or intentionally fired the gun that killed Ward.  (*Jones II, supra*, 86 Cal.App.5th at p. 1085.)  Again, the jury might have thought that Jones *did* make the post-crime statements but chalked them up to bravado (as did the trial court here), so they did not show that he displayed, hit, or fired the gun that killed Ward.  Accordingly, the court's finding in the section 1172.6 proceedings that Jones boasted about the shooting did not impinge upon his right to have a jury determine the firearm-use allegation or his right against double jeopardy.

C.  Post-Claim Statements: Alternative Theory and Due Process

Jones next argues that his due process rights were violated because the trial court relied on a new prosecutorial theory regarding his statements to Hughes and Sabedra.  At his jury trial, the prosecution argued that the statements proved that the firearm-use allegation was true (since he referred to himself as the shooter).  But at the section 1172.6 hearing, the prosecution argued that they showed him bragging about the killing and contributed to the conclusion that he acted with reckless indifference.  Relying on *In re Sakarias* (2005) 35 Cal.4th 140 (*Sakarias*), Jones argues that the prosecutor's alternative theory of the evidence was "fundamentally irreconcilable" with its argument at trial and that evidence cannot have "a completely different meaning when presented to a different trier of fact."  Beside the fact that Jones forfeited these arguments by not raising them earlier, he misreads *Sakarias*.

In *Sakarias*, two defendants were each charged with the murder of the same individual and were tried separately.  (*Sakarias*, *supra*, 35 Cal.4th at p. 147.)  In each trial, the prosecutor "attribut[ed] to each [defendant] culpable acts that could have been committed by only one person" and questioned the medical examiner to elicit evidence that falsely supported the theory that each defendant committed the fatal blows.  (*Id*. at pp. 145, 147–149.)

The California Supreme Court concluded that "fundamental fairness does not permit the People, without a good faith justification, to attribute to *two defendants, in separate trials*, a criminal act only one defendant could have committed.  By doing so, the state necessarily urges conviction or an increase in culpability in one of the cases on a false factual basis, a result inconsistent with the goal of the criminal trial as a search for truth."  (*Sakarias*, *supra*, 35 Cal.4th at pp. 155–156, italics added.)  "At least where

. . . the change in theories between the two trials is achieved partly through deliberate manipulation of the evidence put before the jury, the use of such inconsistent and irreconcilable theories impermissibly undermines the reliability of the convictions or sentences thereby obtained. In short, in the absence of a good faith justification, '[c]ausing *two defendants to be sentenced to death by presenting inconsistent arguments in separate proceedings . . .* undermines the fairness of the judicial process and may precipitate inappropriate results.' " (*Id.* at p. 156, italics added.)

Here, the prosecution did not pursue an inconsistent theory in a separate trial against another defendant. Nor is there any indication that the prosecution manipulated evidence. (See *People v. Ramirez* (2022) 13 Cal.5th 997, 1142 ["central to *Sakarias*'s holding was the fact that the prosecutor modified the evidence he presented in the separate trials to support his inconsistent theories of guilt," which demonstrated "the prosecutor's bad faith," italics omitted].) To the contrary, Jones's statements that he was the shooter could be viewed as both proof that he was the shooter and evidence that he acted with reckless indifference to human life. *Sakarias* is therefore inapposite.

Moreover, Jones again misses the point of section 1172.6. The statute explicitly *permits* the prosecution to try to prove an alternate theory of murder cognizable under current law. "Interpreting section 1172.6 to allow the prosecution to present different theories of guilt at the evidentiary hearing does not implicate constitutional concerns." (*People v. Schell* (2022) 84 Cal.App.5th 437, 444 [the prosecution's new theory of guilt did not violate due process, since the defendant had a full and fair opportunity to present new and additional evidence]; *People v. Flint* (2022) 75 Cal.App.5th 607, 618 [the prosecution may offer new theories of guilt at the section 1172.6 hearing

without implicating double jeopardy concerns].)  Each use of Jones's post-crime statements could be advanced in good faith based on the evidence and the law in effect at the time the prosecutor asserted them.[6]  The prosecutor's arguments therefore did not "defeat[ ] the search for truth" as Jones asserts in his reply brief.  To the contrary, they advanced it.

    D.  <u>Substantial Evidence (Reckless Indifference)</u>

Jones contends that, even if the trial court could consider his statements after the killing, the statements did not show that he harbored reckless indifference when the killing occurred.  He urges that *Emanuel* eviscerated not only this use of his statements, it also precluded consideration of all the factors that supported a reckless indifference finding in *Jones II*.  In addition, he claims that "there was often no evidence" to support the court's findings regarding his youth and maturity.  (Underscoring omitted.)  Accordingly, he concludes that there was no substantial evidence that he acted with reckless indifference to human life.

Jones's arguments have no merit.  His post-killing statements were relevant to whether he acted with reckless indifference.  His reliance on *Emanuel* is misplaced.  The trial court's findings on his youth and maturity were supported by substantial evidence.  And the court's determination that

---

[6] In his reply brief, Jones cites *United States v. Butner* (W.D.Mo., Nov. 14, 2000, No. 98-00174-01-CR-W-1) 2000 U.S.Dist. LEXIS 18005 and *United States v. Duffy* (E.D.N.Y. 2002) 188 F.Supp.2d 281, affd. mem. (2d Cir. 2002) 40 Fed.Appx. 637 to argue that the principle of truth seeking is not dependent on the prosecutor having manipulated evidence or on there being two defendants in separate trials.  But the fact remains that the prosecutorial search for truth must be pursued within the context of prevailing law, and the use of evidence may be used in good faith to argue a legal theory in a section 1172.6 proceeding if the original theory is no longer allowed.

Jones is guilty of murder under current law is supported by substantial evidence, with or without the evidence of his post-crime statements.

### 1. Law of Reckless Indifference to Human Life

Reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.)  It has a subjective and an objective element.  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)  The subjective element requires the defendant to "be aware of and willingly involved in the violent manner in which the particular offense is committed" and to "[consciously disregard] the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801.)  As to the objective element, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617.)  Awareness of a foreseeable risk of death is not enough but knowingly creating a grave risk of death suffices.  (*Scoggins*, at p. 677; *Jones II, supra*, 86 Cal.App.5th at p. 1088.)

Relevant factors in determining whether a defendant acted with reckless indifference to human life include:  "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What

efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra*, 9 Cal.5th at p. 677.) " ' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*Ibid.*)

Additionally, "a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life." (*In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*); see also *Jones II, supra*, 86 Cal.App.5th at pp. 1091–1092.) The " 'hallmark features' of youth" to be considered include " 'immaturity, impetuosity, and failure to appreciate risk and consequences.' " (*Moore*, at p. 454.) "[T]he case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence: (1) their relative impulsivity; and (2) their vulnerability to peer pressure." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489 (*Oliver*).)

As we stated in *Jones II*, Jones "secured the lethal weapon to use in the crime by grabbing the firearm from Byrd." (*Jones II, supra*, 86 Cal.App.5th at p. 1088.) He also "knew the dangers posed by the nature of the felony— robbing a drug dealer of drugs—because he insisted on taking the clip of ammunition that he claimed to need" when Byrd tried to take the bullets out of the gun. (*Ibid.*) "He was present at the scene of the botched robbery and Ward's shooting" and, at best, "provided the murder weapon to the shooter." (*Ibid.*) There was no evidence that he restrained the crime or aided Ward. To the contrary, he left Ward to die. (*Ibid.*) Jones's post-killing statements were "[i]n addition to all that evidence." (*Ibid.*) Thus, the "[e]vidence in the record supported the conclusion that Jones was a major participant in the robbery and acted with reckless indifference to human life." (*Ibid.*) In particular, the evidence suggested that "subjectively, Jones was willingly

27

involved in the violent manner in which the robbery was perpetrated, consciously disregarded the significant risk of death, and *knowingly created a grave risk of death*; objectively, the risk of death was such that its disregard constituted a gross deviation from the standard of a law-abiding person." (*Id.* at p. 1090, italics added.)

We remanded solely for the trial court to consider "Jones's youth as part of the totality of the circumstances germane to determining whether he was a major participant who acted with reckless indifference to human life." (*Jones II*, *supra*, 86 Cal.App.5th at p. 1093.) The question, therefore, is whether substantial evidence supported the court's conclusion on remand notwithstanding the evidence of Jones's youth and maturity.

2. Findings on Youth and Maturity

Substantial evidence supports the trial court's conclusion that Jones's perpetration of the crime was not due to impulsivity, peer pressure, or other hallmarks of youth that preclude a finding of reckless indifference to human life. (See *Oliver*, *supra*, 90 Cal.App.5th at p. 489.) Notwithstanding Dr. Kaur's conclusions, it was reasonable for the court to conclude that Jones had not acted under pressure from older peers, since a younger person hatched the crime, Jones volunteered to perpetrate the crime when others refused, and Jones proclaimed to Dr. Kaur that he was " 'always *the leader*.' " (Italics added.) As the court observed, Jones's peers "essentially [gave him] an out by refusing to participate in the [robbery] and removing the bullets from the gun," but Jones opted for the armed robbery. The fact that he demanded the gun and the ammunition, after witnessing the effects of violence on other occasions, could reasonably be viewed as a calculated evaluation that accomplishing the robbery might require killing someone, and that he was willing "to kill (or to assist another in killing) to achieve a distinct aim."

28

(*Clark*, *supra*, 63 Cal.4th at p. 617). Further, Jones's bragging about the murder tends to show that he was not surprised by the shooting—but proud of it—contrary to an inference of impulsivity.

Jones's arguments to the contrary are unavailing. He argues that the trial court should have drawn different inferences from the evidence, but it is not our role to reweigh the evidence. (*Jones II, supra*, 86 Cal.App.5th at p. 1090.) He also contends that the court's findings on his youth and maturity "were often merely [the] court's own subjective beliefs rather than logical inferences based on evidence." As an example, he points to a passage where the court, after acknowledging Dr. Kaur's testimony that Jones might have become numb to violence, responded as follows: "I gave that consideration here, but [in] my view that's not being impulsive or a transitory rashness or impetuosity. It's really more of an indifference." But this was not a subjective evaluation untethered to the evidence. To the contrary, the court indicated that notwithstanding the evidence of Jones's youth and maturity level, the totality of the circumstances showed that his conduct was not perpetrated due to peer pressure or impulsivity. That inference was reasonable.

Finally, Jones asserts that "the evidence was overwhelming and uncontested that [he] had matured greatly in his nine years of incarceration." But that tells us nothing about his state of mind when he perpetrated the crime. And while Jones claims it is "evidence that the crime was rooted in the 'transient rashness, proclivity for risk, and inability to assess moral consequences' that are hallmark factors of youthfulness and immaturity in crimes," it does not compel the conclusion that Jones perpetrated his crime due to impulsivity or peer pressure. Jones fails to show error in the trial court's consideration of the evidence of his youth and maturity.

29

### 3. Post-Killing Statements as Evidence of Reckless Indifference

The trial court considered Hughes's and Sabedra's testimony that, after the murder, Jones said that Ward " 'told me I needed to shoot him for his weed[;] I don't know who he thought he was so I shot him,' " and that Jones " 'blasted that fool because he wouldn't give it up.' " (*Jones II*, *supra*, 86 Cal.App.5th at pp. 1080–1081). Jones argues that this was "not . . . evidence that he participated in the robbery *prior to* the murder with reckless indifference to life." He is incorrect.

As we noted in *Jones II*, Jones's statements "confirmed his presence at the scene of the shooting, his lack of surprise or concern that Ward was shot, and a callousness toward the victim." (*Jones II*, *supra*, 86 Cal.App.5th at p. 1088.) Those facts relate to the factors germane to whether he harbored reckless indifference to human life. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) Even if Jones did not pull the trigger, the evidence supports the conclusion that he was willing "to assist another in killing[ ] to achieve" the robbery (*Clark*, *supra*, 63 Cal.4th at p. 617), in light of his statement that he " 'blasted that fool *because he wouldn't give it up.*' " (*Jones II*, at p. 1081, italics added.)

The cases that Jones cites do not state that post-killing statements can never be used as evidence of reckless indifference. (*People v. McDonald* (2015) 238 Cal.App.4th 16; *State v. Lacy* (1996) 187 Ariz. 340 [929 P.2d 1288]; *People v. Ware* (2022) 14 Cal.5th 151; *In re Taylor* (2019) 34 Cal.App.5th 543.) Indeed, that is not the law.

In his reply and supplemental briefs, Jones places great reliance on *Emanuel, supra*, 17 Cal.5th 867, claiming that it "overrule[d]" our opinion in *Jones II*. *Emanuel* did nothing of the sort. Nor does *Emanuel* suggest that the trial court's denial of section 1172.6 relief on remand was erroneous.

In *Emanuel*, our Supreme Court concluded that the defendant's role in planning "a strong-arm daylight robbery in a public park" and the lack of evidence that "his actions created a grave risk of death" did not establish that he harbored reckless indifference under *Clark*, *supra*, 63 Cal.4th 522. (*Emanuel*, *supra*, 17 Cal.5th at p. 895.) There, the defendant was *unarmed* and there was no evidence that he knew his coparticipant (Whitley) was armed or likely to use lethal force. (*Id*. at p. 885.) The crime lasted approximately nine minutes and the defendant did not increase the risk of violence. (*Id*. at p. 886.) There was no evidence that he planned an armed robbery or thought that Whitley had a propensity for violence. (*Id*. at p. 887.) He planned only to commit an *unarmed* robbery of a marijuana dealer at a public park in the middle of the afternoon, "in the open," which would tend to decrease the risk of violence. (*Id*. at pp. 887–889.) When the victims refused to relinquish the marijuana, he "attempted to act as a restraining influence" by telling Whitley " 'let's go' " and by walking away. (*Id*. at pp. 878–879, 891.) There was no evidence that he had a meaningful opportunity to restrain Whitley once Whitley spontaneously pulled out a gun. (*Id*. at p. 892.) His post-shooting flight, disposing of a phone, and cutting his hair might have suggested a desire to avoid arrest, but it "reveal[ed] little about whether he acted with the requisite state of mind when the shooting occurred." (*Id*. at p. 895.)

Here, by contrast, Jones *did* know of the presence of a weapon. In fact, he was the one who made sure that he (or his cohort) had a loaded firearm when they robbed Ward. He grabbed Byrd's gun to do the crime. He insisted on taking the ammunition clip when Byrd tried to remove it, stating that he needed it. He therefore planned an *armed* robbery, rather than the unarmed robbery anticipated in *Emanuel*, and anticipated *using* the gun. He excitedly

31

volunteered to perpetrate the crime when others declined. His insistence on taking the firearm and the ammunition knowingly created a grave risk of death because he contemplated the use of lethal force. (See *Emanuel*, *supra*, 17 Cal.5th at pp. 884, 888.) Unlike the daytime robbery in *Emanuel*, Jones planned for the robbery to occur after midnight in a parking lot of an apartment complex. (*Jones II*, *supra*, 86 Cal.App.5th at pp. 1079–1080.) Unlike *Emanuel*, there was no evidence that Jones did anything to prevent the shooting. And critical to the issue here, Jones's statements of his involvement in the shooting were far more indicative of his intent at the time of the crime than the ambiguous conduct in *Emanuel*.

On the latter point, *Emanuel* confirmed "that a defendant's conduct following the use of lethal force *may* be reflective of his or her mental state during the offense." (*Emanuel, supra*, 17 Cal.5th at p. 893, italics added.) The circumstances of Emanuel's flight from the scene, however, made it difficult to ascertain his state of mind. (*Id*. at p. 894.) Postflight conduct may also "shed light on a defendant's state of mind," although "conduct temporally removed from the violent act must clearly evince a culpable mental state." (*Ibid*.) Emanuel's postflight conduct, such as disposing of a phone that he had used to contact his cohort, might reflect a desire to avoid arrest but not much about his mental state when the shooting occurred. (*Id*. at p. 895.)

But here, Jones's postflight conduct *did* evince a culpable mental state. He bragged to Hughes about the shooting shortly after it occurred. He stated that Ward " 'told me I needed to shoot him for his weed' " and " 'so I shot him.' " (*Jones II*, *supra*, 86 Cal.App.5th at p. 1080). That same morning, he joked around in Sabedra's apartment and, while walking with her to the store, he laughed and said that he " 'blasted that fool because he wouldn't give it up.' " (*Id*. at p. 1081.) This was not mere indifference to the fact that

32

someone was killed. (Cf. *Emanuel, supra,* 17 Cal.5th at p. 895.) Nor was it ambiguous conduct that could reflect nothing more than a general desire to avoid law enforcement or association with the perpetrator. Spoken not long after Ward was gunned down, it provided crucial insight into Jones's state of mind when the shooting occurred. It explained why Ward was killed. It reflected Jones's mindset that it was laudatory to murder someone for not turning over marijuana. It is reasonable to infer that he harbored that frame of mind when he grabbed the gun and ammunition, arrived at the scene, and robbed Ward, resulting in Ward's shooting death.

Moreover, the point in *Emanuel* was that the defendant's post-crime conduct was not sufficient *by itself* to establish reckless indifference *under the circumstances of that case.* "[E]ven if a defendant is unconcerned that the planned felony resulted in a death, there must also be evidence that the defendant was aware of and willingly involved in the violent manner in which the felony was committed and consciously disregarded the significant risk of death that his or her actions created." (*Emanuel, supra,* 17 Cal.5th at p. 895.)[7] There was no such evidence in *Emanuel.* But here, there was.

4. <u>Substantial Evidence in the Totality of the Circumstances</u>

Jones insists that his crime was "a garden-variety armed robbery" and that "[g]etting a gun is not evidence of reckless indifference, because the mere

---

[7] (See *Emanuel, supra,* 17 Cal.5th at p. 895 ["[t]hough the [defendant's conduct following a killing] *may be evidence* [that the defendant acted with indifference toward the grave risk that someone could be killed], it is *insufficient, standing alone,* to support murder liability," italics added].) There is nothing new about this statement of the law. (E.g., *In re Taylor, supra,* 34 Cal.App.5th at p. 560 [statements after a murder may be relevant to whether the defendant acted with reckless indifference, but under *Banks* and *Clark* they are insufficient, standing alone, to constitute substantial evidence that defendant acted with reckless indifference to human life in participating in the attempted robbery].)

existence of an armed robbery is insufficient evidence of reckless indifference." But "what [our Supreme Court] meant by 'a garden-variety armed robbery' " is "[a] robbery in which the *only factor* supporting reckless indifference to human life is the fact of the use of a gun." (*Clark, supra*, 63 Cal.4th at p. 617, fn. 74, italics added.) Here, in addition to a gun being used in the robbery, Jones participated in the planning, offered to perpetrate it when others declined, obtained the firearm and insisted on loading the ammunition because he needed it, was at the scene of the robbery and shooting, and did not seek help for the victim after the shooting. He then boasted twice about the shooting shortly after it occurred, reflecting his state of mind that a victim's refusal to turn over some marijuana justified shooting him to death. Taken together, the totality of the circumstances demonstrate that Jones was "aware of and willingly involved in the violent manner in which the felony was committed and consciously disregarded the significant risk of death that his . . . actions created." (*Emanuel, supra*, 17 Cal.5th at p. 895.) He did not just participate in an armed robbery, he personally and knowingly created a grave risk of death.

Besides rearguing the evidence, Jones contends that *Emanuel* undermines our reliance in *Jones II* on other evidence of reckless indifference, such as Jones's failure to mitigate the risk of violence and his leaving Ward to die. He claims that "nothing remains of this Court's opinion in *Jones II* that could be found as sufficient evidence of reckless indifference to life." We are not persuaded that *Emanuel* has undone the longstanding recognition of the circumstances in *Jones II* that, in their totality, demonstrate reckless indifference to human life.

In sum, there is substantial evidence that, "at the time of the shooting, [Jones] acted with indifference toward the grave risk that someone *could be*

killed." (*Emanuel*, *supra*, 17 Cal.5th at p. 895.)  Jones fails to demonstrate error.[8]

## III.  DISPOSITION

The order is affirmed.


CHOU, J.


WE CONCUR.


JACKSON, P. J.
BURNS, J.


A169359/ *P. v. Jones*

---

[8] The People requested judicial notice of the record in case Nos. A154492 and A162634.  We grant the unopposed request.